IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **HORSEMEN'S BENEVOLENT & PROTECTIVE ASSOCIATION – OHIO DIVISION, INC.,** : : : : | |
| **Plaintiff,** : | **Case No. 2:20-cv-6471** |
| : | |
| v. : | **CHIEF JUDGE ALGENON L. MARBLEY** |
| : | |
| : | **Magistrate Judge Kimberly A. Jolson** |
| **BELTERRA PARK,** *et al.***,** : | |
| : | |
| **Defendants.** : | |

**<u>OPINION & ORDER</u>**

This matter comes before the Court on Defendants' Motion to Dismiss Plaintiff's Complaint for failure to state a claim. (ECF No. 6). The Court has determined that it can resolve this Motion on the papers and without oral argument. For the reasons that follow, the Motion to Dismiss is **DENIED**.

I.     BACKGROUND

And we're off. This case of first impression arises out of a statutory framework for sharing video slot revenues between Ohio's seven "racinos" and the two horsemen's associations that breed and race horses in Ohio, one of which is Plaintiff Horsemen's Benevolent & Protective Association – Ohio Division, Inc. ("OHBPA"). These "video slots" are also known as "video lottery terminals" ("VLTs"), and the racing tracks where they are located are known colloquially as "racinos." Defendant Belterra Park is a horse racing track, with VLTs, in Cincinnati, Ohio, and is the trade name for Defendant PNK (Ohio), LLC ("PNK" or "Belterra"). (ECF No. 1 ¶ 3). At the time of the track's May 2014 reopening, Defendant Pinnacle Entertainment, Inc. was the owner and majority member of PNK. That interest passed to Defendant Penn National Gaming, Inc., and

1

later to Defendant Boyd Gaming Corporation, through acquisition and sale. (*Id.* ¶¶ 4–6). OHBPA seeks over 2.7 million dollars, plus interest, that Defendants allegedly owe for having underpaid on their VLT revenue sharing over a more than four-year period. (*Id.* ¶ 27).

### A. General Assembly Establishes VLT Revenue Sharing Framework

In 2013, the Ohio General Assembly enacted a law, codified at O.R.C. § 3769.087(C), to give the Ohio State Racing Commission (the "Racing Commission") greater responsibilities over setting the percentage of racinos' VLT commissions owed to the horsemen's associations. (ECF No. 1 ¶¶ 17–18). The statutory framework dictates that a portion of the racino's VLT commission—between 9% and 11%—is to be paid by the racino for the benefit of horse breeding and racing in Ohio. (*Id.* ¶ 14). The statute sets forth two methods to determine the exact percentage of VLT commission to be paid. First, the racino and the applicable horsemen's association could agree and contract for that percentage. Second, absent an agreement, the Racing Commission would set the percentage rate via an administrative rule, to be paid to the Racing Commission for the benefit of horse breeding and racing. O.R.C. § 3769.087(C). In the latter case, the Racing Commission is required to set a rate for each racino within six months of the date the racino begins its VLT operations. *Id*. Because the rate-setting depends on the racino's capital expenditures, the racino must submit a capital expenditures report to the State for approval—a process over which the horsemen's association has no control. (ECF No. 1 ¶ 22).

Thus, in short, the statute required the Racing Commission to set the percentage rate owed to the OHBPA within six months after the first coin dropped at Belterra Park, assuming there was no agreement between the track and OHBPA prior to such time. (*Id.* ¶ 18).

### B. Belterra Park Reopens; Escrow Agreement Sets Aside 9% of VLT Commission

On May 1, 2014, the day that Belterra Park reopened, no rate agreement had been reached with OHBPA. Belterra therefore entered into an Escrow Agreement with the Racing Commission on that same day, which would terminate once the Racing Commission set the final rate by rule. (ECF No. 6 Ex. A). Plaintiff states that the Escrow Agreement set aside 9% of Belterra's VLT commission, which OHBPA began receiving on May 1, 2014. (ECF No. 1 ¶ 20).

By November 2014, six months after Belterra Park reopened, the Racing Commission had not set the percentage of Belterra's VLT commission owed to OHBPA. OHBPA and Belterra tried to reach an agreement on the percentage but failed to do so. (*Id.* ¶ 21). In fact, the Racing Commission would not set its rate for about four years, allegedly due to various delay tactics employed by Defendants. OHBPA maintains that Belterra's capital expenditure submissions were unrealistic and overly aggressive attempts to persuade the authorities that it was entitled to the lowest statutory rate; this caused delays in the determination by the Racing Commission. (*Id.* ¶ 22). OHBPA had no access to Belterra's records of purported capital expenditures and no way to expedite the rate-setting process. (*Id.*).

By Plaintiff's account, OHBPA and Belterra each understood that, pursuant to the statute, the actual rate was to be set by the Racing Commission, and that Belterra would need to make a "catch-up" payment to OHBPA for any difference between the 9% placeholder rate in the Escrow Agreement and the actual rate so set. (*Id.*). Plaintiff contends that the delay in setting the statutory rate was due to Belterra's years of stalling before providing to the State a reasonable submission of capital expenditures incurred.

### C. Racing Commission Sets VLT Rate at 9.95%, Above Escrow Rate

On June 27, 2018, the Racing Commission passed Resolution No. 2018-05. (ECF No. 6 at 4 & Ex. B). This resolution set the VLT commission percentage at 9.95%. As of July 1, 2018, Belterra began paying, and OHBPA began receiving, the 9.95%. As Defendants emphasize, the resolution does not contain any express language making the higher rate retroactive to May 1, 2014.

### D. Complaint and Motion to Dismiss

OHBPA filed a two-count Complaint on December 18, 2020, alleging conversion and unjust enrichment. (ECF No. 1). The core factual allegation is that Defendants have failed to pay OHBPA the marginal 0.95% of Belterra Park's VLT commission between May 1, 2014, and July 1, 2018, totaling $2,769,652 without interest. Defendants moved to dismiss for failure to state a claim. (ECF No. 6). The general issue this case presents is whether Defendants are obligated to pay the marginal percentage of the VLT commission to OHBPA as a catch-up payment. Given the early procedural posture of this case, the specific question on Defendants' Motion to Dismiss is whether OHBPA has stated a complete and sufficient cause of action.

## II. STANDARD OF REVIEW

Into the turn. A motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted "is a test of the plaintiff's cause of action as stated in the complaint, not a challenge to the plaintiff's factual allegations." *Golden v. City of Columbus*, 404 F.3d 950, 958–59 (6th Cir. 2005). When evaluating a motion to dismiss under Rule 12(b)(6), "[a]ll factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). But the court "need not . . . accept unwarranted

factual inferences." *Id.* Complaints must state "more than a bare assertion of legal conclusions to survive a motion to dismiss." *Horn v. Husqvarna Consumer Outdoor Products N.A., Inc.*, 2013 WL 693119, at *1 (S.D. Ohio Feb. 26, 2013) (citing *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993)). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### III. LAW & ANALYSIS

Onto the backstretch. Defendants seek dismissal of OHBPA's Complaint for three reasons: (1) there is no private right of action to enforce the statute or regulation; (2) OHBPA has no right to the payments; and (3) OHBPA cannot satisfy the necessary elements for unjust enrichment and conversion as a matter of law. The Court will review each allegation in turn.

### A. Right to Sue

Defendants seek dismissal, stating that neither O.R.C. § 3769.087(C) nor O.A.C. § 3769-2-43 allows for a private cause of action. Instead, Defendants argue that both the statute and regulation are to be enforced by the State. (ECF No. 6 at 9). OHBPA does not purport to bring claims under Chapter 3769, but rather styles its claims as common-law conversion and unjust enrichment. (ECF No. 1). The common-law claims do depend on Section 3769.087(C) to establish the right to payment and the injustice in withholding it. In other words, OHBPA seeks to import the statutory duty into common-law actions. Thus, in addition to meeting Defendants' objections on the statutory cause of action, OHBPA also argues that the statute does not preempt common-law rights. (ECF No. 14 at 5–6).

Taking OHBPA's claims as they are styled—in common law—it is not necessary for OHBPA to establish a statutory right of action. Only the absence of preemption is required. Defendants would have the Court ignore the labeling and view OHBPA's claims as direct

5

enforcement of the statute. (ECF No. 6 at 6). But the distinction is not without meaning. Common-law claims can be premised on statute[1]—unless the statute preempts them by creating a new right with an exclusive remedy. *See Lynch v. Dial Fin. Co.*, 656 N.E.2d 714, 719 (Ohio Ct. App., 8th Dist., 1995). Pleading a common-law action might entail different elements than a statutory cause; here, the "wrongfulness" element of conversion and the "benefit" element of unjust enrichment are unique to common law.

The Court will take up OHBPA's preemption argument first. It will consider Defendants' statutory arguments for completeness; but if OHBPA succeeds on preemption, then its common-law claims would survive even absent a statutory right of action.

### 1. Preemption

Whether an Ohio statute precludes a common-law cause of action depends upon whether the statute complements existing common-law rights or creates new rights previously unknown to common law. In the former case, "a state statute does not preempt preexisting common law unless it specifically expresses an intention to do so." *Eisenberg v. Anheuser-Busch, Inc.*, 2006 WL 290308, at *7 (N.D. Ohio Feb. 2, 2006), *vacated on other grounds by Alston v. Advanced Brands & Imp. Co.*, 494 F.3d 562 (6th Cir. 2007). In the latter, the test differs. "When the legislature creates a statutory right unknown to the common law . . . , complete with meaningful statutory remedies, there can exist no parallel common-law or public policy tort claim." *Lynch*, 656 N.E.2d at 719. *See also City of Zanesville v. Fannan*, 42 N.E. 703, 706 (Ohio 1895) ("[W]here a statute creates a new right, and prescribes the remedy for its violation, the remedy thus prescribed is

---

[1] Consider the context of wrongful discharge, a tort, where "[i]t is clear that a civil rights statute prohibiting employment discrimination on the basis of sex may provide the necessary expression of public policy on which to premise a cause of action for wrongful discharge based on sexual harassment/discrimination." *Collins v. Rizkana*, 652 N.E.2d 653, 659 (Ohio 1995). Another example, more analogous, is where funds are wrongly withheld despite a statutory right to payment; in that context, "the ultimate relief sought is equitable restitution," a common law claim. *Measles v. Indus. Comm'n of Ohio*, 946 N.E.2d 204, 207 (Ohio 2011).

exclusive; but when a new remedy is given by statute for rights of action existing independent of it, without excluding other remedies already known to the law, the statutory remedy is cumulative merely, and the party may pursue either at his option.").

The right of horse breeding and racing associations to receive a share of VLT commissions is a new one; absent Section 3769.087(C), OHBPA would have no right to the payments, and its common-law claims would fail.[2] But the novelty of the right does not, on its own, preempt common-law actions. In the case of a new statutory right, preemption also depends on whether the statute is "complete with meaningful statutory remedies." *Lynch*, 656 N.E.2d at 719.

This completeness element is lacking. The remedies contained elsewhere in the Chapter—fines or license suspension by the Racing Commission or Tax Commission—are not meaningful with respect to OHBPA, which cannot institute either action. *See* O.R.C. § 3769.10; O.A.C. § 3769-2-99. Even in the scenario, not at play here, where the racino and horsemen's association agree to a percentage in lieu of the Racing Commission setting one by rule, there is no statutory mechanism for a horsemen's association to initiate a complaint. The outcome likely would be different if the Chapter contained some petition or hearing process whereby OHBPA could be heard. *Cf. Franklin Cty. Law Enforcement Ass'n v. FOP*, 572 N.E.2d 87, 90 (Ohio 1991) (law for resolving public-sector labor disputes preempted declaratory relief because it created a new right *and* "set[] forth detailed procedures for the hearing of unfair labor practice charges" brought by the aggrieved party to a state board); *Fletcher v. Coney Island, Inc.*, 134 N.E.2d 371, 374 (Ohio 1956) (nondiscrimination statute for places of public accommodation preempted injunctive relief

---

[2] It is for this reason that OHBPA's cases on preemption of *existing* common-law causes of action are inapposite. In *Bresnik v. Beulah Park Ltd. P'ship, Inc.*, the court recognized that Chapter 3769 of the Ohio Revised Code and its accompanying regulations do not overarchingly preempt the *existing* common-law right of a property owner to exclude others from the property. 617 N.E.2d 1096, 1098 (Ohio 1993). And in *Collins*, the court allowed the plaintiff to present a wrongful discharge tort claim that was "independent of" the state statute on sexual harassment and discrimination. 652 N.E.2d at 660.

7

because it created a new right *and* authorized a civil action by the aggrieved party for a prescribed financial penalty). But that is not the case here; it is entirely incumbent upon the State Commissions to institute an action for the catch-up payments, which they so far have declined to do.

From OHBPA's standpoint, Chapter 3769 gives them a right without a remedy. The law entitles OHBPA to payments but does not provide the procedure or framework by which OHBPA can secure them. The legislature cannot have intended such an outcome, and this Court will not compel it. Therefore, the Court holds that OHBPA's common-law claims for conversion and unjust enrichment are not preempted by Chapter 3769.

2. *Express Private Right of Action*

Again, since OHBPA does not state a cause of action under the statute, it is not necessary for them to establish a statutory right of action, express or implied. Given the briefing on this issue, the Court nonetheless will hear the arguments.

Defendants contend that neither O.R.C. § 3769.087(C) nor its implementing regulation, O.A.C. § 3769-2-43, expressly establishes a private right of action. Defendants have the better of this argument. OHBPA cannot identify any language in the statute or regulation itself establishing a cause of action. OHBPA does identify a five-year rule review by the Racing Commission, which posed the following question: "Does this rule impose a criminal penalty, a civil penalty, or another sanction, or create a cause of action, for failure to comply with its terms?" The answer: "Yes[.] The permit holder [*i.e.*, Defendants] could be required to pay [an] additional percentage point to the horsemen for the benefit of breeding and racing." (ECF No. 14 Ex. A at Item 16.B). Because the question is posed in the disjunctive, the "Yes" answer could refer to *either* a penalty or sanction

8

*or* a cause of action. The narrative explanation makes no reference to a cause of action, which suggests that the cause of action clause is not what triggered the affirmative answer.

Accordingly, the rule review does not provide the express statement that is missing in the statute and regulation. Absent an express right of action, the Court will next consider whether OHBPA could sue under an implied right of action.

### 3. Implied Private Right of Action

Before inferring a private right of action, courts follow the Supreme Court's test in *Cort v. Ash.*

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted . . . ? Second, is there any indication of legislative intent, either explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

422 U.S. 66, 78 (1975) (internal citations omitted), *recognized in Strack v. Westfield Cos.*, 515 N.E.2d 1005, 1007 (Ohio Ct. App., 9th Dist., 1986).[3]

Defendants concede for present purposes that OHBPA likely is a member of the class for whom Section 3769.087(C) was enacted. (ECF No. 17 at 13). And for good cause; there are only two horsemen's associations to whom the statutory scheme applies. (ECF No. 1 ¶ 13). Defendants do contend, however, that OHBPA falls short on the remaining factors.

On the legislative intent question, the statute contains no language either to favor or disfavor a private remedy. The Chapter's enforcement provisions, cited by Defendants, likewise do not establish or deny their exclusivity. *See* O.R.C. § 3769.10; O.A.C. § 3769-2-99. OHBPA argues that the General Assembly knows how to bar a private right of action and often does so

---

[3] There is a fourth question under *Cort*, which asks whether "the cause of action [is] one traditionally relegated to state law . . . so that it would be inappropriate to infer a cause of action based solely on federal law." *Cort*, 422 U.S. at 78. The fourth question is not at issue here since the cause of action is to be inferred, if at all, under state law.

9

explicitly. (ECF No. 14 at 13). The same could be said, admittedly, for creating a private right of action. As a general proposition, though, where the legislature creates rights, it ordinarily is presumed to have intended them to be enforceable. *See, e.g.*, *Upperman v. Grange Indem. Ins. Co.*, 842 N.E.2d 132, 136 (Ohio Ct. C.P., Franklin Cty., Mar. 24, 2005) ("[T]he General Assembly never contemplated that policyholders should be left without recourse if an insurer operates outside the regulatory structure."); *Edwards v. Perry Twp. Bd. of Trs.*, 2016 WL 4062842, at *3 (Ohio Ct. App., 5th Dist., 2016) ("[T]he use of the term 'shall' indicates a legislative intent to create an enforceable right. . . . If a private right of action is not implied, full-time employees will have no remedy for any breach of the duty to provide insurance."). At least at this pleading stage, where a plaintiff is entitled to reasonable inferences in her favor, legislative intent could be presumed to favor a right of action for OHBPA—either by permitting concurrent common-law remedies or by implying a statutory right of action. To foreclose relief on silence alone would be premature.

On the consistency question, the Court determines that a private remedy would be consistent with the legislative scheme. The clear motivation for Section 3769.087(C), appearing directly in the text, is to direct resources "for the benefit of breeding and racing in this state." OHBPA seeks here to recover funds withheld in derogation of that purpose. Furthermore, the remedy at issue would be a narrow one, invocable only by the two horsemen's associations and only to enforce their right to the payments that the General Assembly has directed. Because the remedy is in harmony with the legislative scheme, this factor also would favor OHBPA.

Having analyzed the *Cort* factors, the Court is not convinced at this stage that Section 3769.087(C) necessarily lacks an implied private right of action.

## B. Entitlement to Catch-Up Payments

Around the far turn. Defendants next assert that, even if a private right of action exists, dismissal is appropriate because OHBPA is not entitled to payment. (ECF No. 6 at 6, 9). Specifically, Defendants state that there is no express language—in the statute, regulation, or Escrow Agreement—requiring Defendants to pay *any* amount of VLT commission directly to a horsemen's association. (*Id.* at 6–8). They also note the lack of express language requiring catch-up payments and take issue with retroactive application of the higher 9.95% rate over the preceding four-year period. (*Id.* at 9–13).

Defendants' course of conduct belies their first argument. As a threshold consideration, there are only two horsemen's associations in the State of Ohio, and they are not in competition. OHBPA is the Racing Commission-recognized association for thoroughbreds. (ECF No. 1 ¶ 2). The other, the Ohio Harness Horsemen's Association, is the recognized association for harness racing. (*Id.* ¶ 13). Defendants offer no suggestion of how the 9% to 11% of commission would be paid out to benefit horse racing and breeding, if not to OHBPA. In fact, it appears that Defendants have made their payments exclusively to OHBPA. Despite Defendants contending that the Escrow Agreement does not mention OHBPA, they admit that OHBPA did receive the full escrowed amount (9% of commission) between May 1, 2014, and July 1, 2018. (ECF No. 6 at 4). And despite Defendants contending that, per the regulation, payments set by rule are to be paid to the Racing Commission, they also admit that OHBPA received the full 9.95% once the Racing Commission issued its rule. (*Id.* at 4–5).[4] The logical conclusion from this course of action, which Defendants do not rebut, is that OHBPA is entitled to the payments.

---

[4] The Commission seems to agree with this result. Its five-year rule review contemplates a payment "to the horsemen," not to the Commission. (ECF No. 14 Ex. A at Item 16.B).

11

On retroactivity, Defendants correctly observe that the statute, regulation, and resolution do not specify catch-up payments. (*Id.* at 9–13). But nor do they grant Defendants leave to pay the statutory minimum while the Racing Commission determined the actual rate—especially under circumstances where Defendants are alleged to have engaged in bad-faith delay. The statute and regulation refer to only one percentage rate, falling between 9% and 11% as determined by the Racing Commission. They do not provide any method for changing the percentage so determined, which suggests that the rate is intended to be fixed—even if it could not be known to a certainty until the State had reviewed the capital expenditure reports.

Defendants' reliance on the Escrow Agreement is misplaced. (*Id.* at 10). While the statute does permit a racino to discharge its duty by agreement with the horsemen's association, it does not permit a racino to do so by contract with the Racing Commission. Moreover, nothing in the Escrow Agreement indicates that it is in final satisfaction of Defendants' statutory duties. The Escrow Agreement can exist in harmony with an obligation to make catch-up payments if the Racing Commission later set the rate above 9%.[5] Therefore, in view of both the law and the Agreement, OHBPA is correct that Defendants "had no reasonable expectation that the 9% it 'escrowed' was final." (ECF No. 14 at 16 n.3).

This outcome would be different if, for instance, the legislation had fixed a 9% rate and then sought, years later, to impose a "'new or additional burden[]'" across the entire period. *See, e.g., Walter v. Fairfield City Schs.*, 2011 WL 13202536, at *6 (S.D. Ohio July 18, 2011) (quoting *Bielat v. Bielat*, 721 N.E.2d 28, 33 (Ohio 2000)). That is not the case here. The obligation always was between 9% and 11%, contingent upon review of Defendants' capital expenditure reports.

---

[5] Setting aside the minimum of 9% assured that most (and possibly all) of the required payments would be made, limiting the catch-up payments to no more than 2%. A better Escrow Agreement perhaps would have placed the statutory *maximum* of 11% into escrow, such that Defendants would be covered up to their highest possible liability and would receive a refund if the percentage was set any lower.

Also of note, OHBPA alleges that the Racing Commission has acknowledged a catch-up payment is due from Defendants to OHBPA. (ECF No. 1 ¶ 26). This position, as an agency's interpretation of statute, is entitled to deference. *See, e.g.*, *Frisch's Rests., Inc. v. Ryan*, 901 N.E.2d 777, 781–82 (Ohio 2009). The position is consistent with both the Racing Commission's rate-setting resolution and its five-year rule review. The resolution gave no effective date, which it presumably would do if intended to replace a different rate then in effect. (ECF No. 6 Ex. B).[6] And the rule review contemplates a payment "to the horsemen." (ECF No. 14 Ex. A at Item 16.B).

For all of these reasons, OHBPA has established a plausible entitlement to catch-up payments under Section 3769.087(C). To support Defendants' contrary position, the Court would need to read a clause into the statute allowing for different rates before and after the Racing Commission's determination, into the Escrow Agreement to state that the 9% set-aside is in full satisfaction, and into the resolution to set an effective date of July 1, 2018. By Defendants' own cited authority, none of this is permissible. (*Id.* at 8, 10) (citing *Rosette v. Countrywide Home Loans, Inc.*, 825 N.E.2d 599, 601 (Ohio 2005); and *State v. Gonzales*, 81 N.E.3d 419, 420 (Ohio 2017)).

### C. Common-Law Claims: Conversion and Unjust Enrichment

#### 1. Conversion

Down the homestretch. To establish a prima facie claim of conversion under Ohio law, a plaintiff must satisfy three elements: "'(1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages.'" *McCaughey v. Garlyn Shelton, Inc.*, 2008 WL

---

[6] The resolution was adopted on June 27, 2018, (ECF No. 6 at 4), but Defendants treated it as effective July 1, 2018, also without clear textual support. (*Id.* at 5).

13

150017, at *3 (S.D. Ohio Jan. 14, 2008) (quoting *City of Findlay v. Hotels.com, L.P.*, 441 F. Supp. 2d 855, 865 (N.D. Ohio July 26, 2006)).

Defendants argue that OHBPA's claim for conversion fails because it has no statutory or contractual right to the catch-up payments, and, therefore, Defendants' retention of those funds is not wrongful. (ECF No. 6 at 13). The Court's finding of a plausible statutory entitlement to the funds, *supra* Section III.B., is dispositive as to both the first and second elements.

Moreover, as to wrongfulness, OHBPA has alleged bad faith in Defendants' multi-year delay, using unrealistic and overly aggressive capital expenditures in an apparent effort to persuade authorities that it was entitled to pay a lower final rate. (ECF No. 1 ¶ 22). Without the report, the Racing Commission could not determine its final rate, which allowed Defendants to continue setting aside only the statutory minimum (9%) per the Escrow Agreement. (*Id.*). This too supports a finding of wrongful conduct, satisfying the second element.

Defendants do not dispute the third element, damages. OHBPA has pled $2,769,652 in converted funds, exclusive of interest, which completes its prima facie case. (*Id.* ¶ 27). Plaintiff's Count One will not be dismissed.

### 2. Unjust Enrichment

Under Ohio law, an unjust enrichment claim requires the plaintiff to prove the following: "(1) a benefit conferred by the plaintiff upon the defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *MVB Mortg. Corp. v. FDIC*, 2010 WL 654051, at *3 (S.D. Ohio Feb. 19, 2010). The purpose of unjust enrichment is "'to compensate the plaintiff for the benefit he has conferred upon another, not to compensate him for a loss suffered.'" *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009) (quoting *Jones v. Jones*, 903 N.E.2d 329, 337 (Ohio

14

Ct. App., 3d Dist., 2008)). Because unjust enrichment is a quasi-contract remedy, "a plaintiff cannot recover for unjust enrichment when an express contract governs the subject matter of the litigation." *McCarthy v. Ameritech Pub., Inc.*, 763 F.3d 469, 487 (6th Cir. 2014) (citing *Wuliger*, 567 F.3d at 799).

Defendants contend that OHBPA's claim for unjust enrichment fails for three reasons: (1) an express contract, the Escrow Agreement, covers the VLT commission payments; (2) OHBPA did not confer a benefit on Defendants; and (3) retention of catch-up payments is not unjust because OHBPA did not have a right to those payments in the first place. (ECF No. 6 at 15).

As a threshold argument, Defendants state that OHBPA's claim is barred because an express contract (the Escrow Agreement, to which OHBPA is a third-party beneficiary) covers payment of the VLT percentage rate and precludes any claim for unjust enrichment. (*Id.* at 15–16). Defendants are correct that a claim for unjust enrichment generally is precluded where a valid, express contract covers the same issue. *See Cook v. Home Depot U.S.A., Inc.*, 2007 WL 710220, at *8 (S.D. Ohio Mar. 6, 2007) ("Ohio law does not allow parties to seek damages under quasi-contractual theories of recovery such as a claim of unjust enrichment when a contract governs the relationship.") (internal quotation omitted). But Defendants have not established that the Escrow Agreement in fact covers the *same* issue as the unjust enrichment claim. In particular, and as discussed *supra* Section III.B., the Escrow Agreement does not relieve Defendants of their duty to pay a rate exceeding the 9% floor, if the Racing Commission so determined. OHBPA's claimed right to the catch-up payments sounds in the statute, not the Escrow Agreement.[7]

---

[7] Defendants' citation to *Davidson v. Davidson*, 2005 WL 3274853 (Ohio Ct. App., 3d Dist., 2005), is therefore inapposite. (ECF No. 6 at 14, 15). In *Davidson*, the plaintiff, who was a third-party beneficiary of a promissory note, was precluded from bringing an unjust enrichment claim for compensation due *on the note*. Here, OHBPA is not seeking payment due on the Escrow Agreement; it undisputedly received the 9% set aside. OHBPA is seeking payment of the marginal 0.95% it claims is due under the statute and Racing Commission resolution.

15

To the first element of unjust enrichment, Defendants argue that OHBPA did not confer any benefit on Defendants. (ECF No. 6 at 16–17). They point to OHBPA's passive allegation that "[a] benefit was conferred upon Defendants by virtue of their retention of the Converted Funds." (ECF No. 1 ¶ 32). The passive voice is appropriate because OHBPA is not alleging that it rendered a service valued at 9.95% of VLT commission. But nor is it required to do so. When this Court recently decided *Clark v. Pizza Baker, Inc.*, it noted that "the core inquiry" in an unjust enrichment case is not the existence of an economic transaction, but "whether the benefit conferred 'contains an element of causation.'" 2020 WL 5760445, at *3 (S.D. Ohio Sept. 28, 2020) (Marbley, J.) (quoting *Randleman v. Fid. Nat'l Title Ins. Co.*, 465 F. Supp. 2d 812, 824 (N.D. Ohio Nov. 17, 2006)). The Court held that a "contribut[ion] to Defendants' increased profits" was enough to satisfy the benefit element, since "Plaintiffs' losses are causally connected to [Defendants'] gain." *Id.* OHBPA plausibly alleges that Defendants retained funds to which OHBPA had a statutory right. It follows that a benefit accrued to Defendants' bottom line because those funds were not flowing to OHBPA. Thus, this Court finds that OHBPA has alleged a benefit conferred upon Defendants sufficient to overcome a motion to dismiss.[8]

Defendants do not challenge the second element, their knowledge of the benefit conferred. OHBPA has pled that element sufficiently, so it is satisfied. (ECF No. 1 ¶ 33).

The third and final element is that the retention of the benefit by the defendant must necessarily be "unjust." *MVB Mortg. Corp.*, 2010 WL 654051, at *3. Defendants state that even if a benefit was conferred, it was not retained unjustly because PNK made the required 9% payments beginning May 1, 2014, under the Escrow Agreement, which increased to 9.95% on July 1, 2018,

---

[8] To indulge Defendants' view that the benefit should be conferred actively by OHBPA, as in a service rendered, (ECF No. 17 at 9–10), it bears noting that there can be no racino without racehorses. By promoting horse breeding and racing in Ohio, OHBPA is bringing in the customers and making the racino business model viable.

16

after the Racing Commission passed its resolution. (ECF No. 6 at 17–18). Again, the Court has found that OHBPA plausibly was entitled to 9.95% across the entire period. *See supra* Section III.B. Moreover, OHBPA has alleged bad faith in Defendants' delay before submitting the capital expenditure report. (ECF No. 1 ¶ 22). Under these circumstances, which at this stage are taken as true, it would be unjust for Defendants to withhold the marginal 0.95% to which OHBPA is entitled by statute, especially when Defendants were enabled by bad-faith delay.[9]

Accordingly, this Court finds that OHBPA has stated a complete claim for unjust enrichment. Plaintiff's Count Two will not be dismissed.

### IV.     CONCLUSION

Across the finish, it's Plaintiff. For the reasons set forth above, Defendants' Motion to Dismiss (ECF No. 6) is **DENIED**.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY
CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:  September 30, 2021**

---

[9] For OHBPA ultimately to prove bad faith, it likely will require evidence of intent gained through the discovery process; that too counsels in favor of preserving the claim. *See Wiggins v. Bank of America, N.A.*, 2020 WL 6481983, at *4 (S.D. Ohio Nov. 4, 2020).