**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| HORSEMEN'S BENEVOLENT & | : | |
| PROTECTIVE ASSOCIATION, | : | |
| | : | **Case No. 2:20-cv-6471** |
| Plaintiff, | : | |
| | : | **Chief Judge Algenon L. Marbley** |
| v. | : | |
| | : | **Magistrate Judge Kimberly A. Jolson** |
| BELTERRA PARK, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**OPINION & ORDER**

This matter is before the Court on Plaintiff's Motion for Summary Judgment (ECF No. 31) and Defendants' Motion to Certify a Question of State Law to the Supreme Court of Ohio. (ECF No. 33). For the reasons set forth herein, Defendants' Motion to Certify is **DENIED** and Plaintiff's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

## I.  BACKGROUND

### A.  Factual Background

Plaintiff in this matter is Horsemen's Benevolent & Protective Association – Ohio Division, Inc. ("OHBPA"). Defendants are Belterra Park, Pinnacle Entertainment, Inc., and Penn National Gaming, Inc. Plaintiff is a non-profit trade organization representing thoroughbred owners and trainers who race at Ohio's three commercial thoroughbred racetracks, including Belterra Park. (ECF No. 1 ¶ 2). Relevant to this matter, Plaintiff also negotiates with track management and represents its members' interests at Ohio's tracks. (*Id.*).

Belterra Park is the trade name for PNK (Ohio), LLC, the permit holder entitled to conduct horse racing at the horse racing track commonly known as "Belterra Park." (*Id.* ¶ 3). Defendant Belterra Park operates a thoroughbred horse track. (*Id.*). At the time of the track's May 2014

1

reopening, Defendant Pinnacle Entertainment, Inc. was the owner and majority member of PNK. (*Id.* ¶ 4). Through acquisition and sale, Pinnacle's interest passed to Defendant Penn National Gaming, Inc. in October 2018, then to Defendant Boyd Gaming Corporation. (*Id.* ¶¶ 5–6). Boyd is the current owner and/or majority member of PNK (Ohio), LLC. (*Id.* ¶ 6).

This Court's September 30, 2021 Order on Defendants' Motion to Dismiss (the "prior Order") captures the facts in this case. (ECF No. 24). This Order summarizes the facts in Plaintiff's Complaint—which are generally unchallenged by Defendants—only as relevant. In 2009, Ohio authorized the operation of video lottery terminals ("VLTs"), commonly referred to as "video slots," at Ohio's horse racing tracks ("racinos"). (*Id.* ¶ 12). Ohio's General Assembly provided a framework requiring each racino's net-win VLT revenues to be split between the track (receiving 66.5% of the revenues) and the Ohio Lottery Commission (receiving 33.5% of the revenues). (*Id.* ¶ 13). The General Assembly further required that the track pay out 9–11% of its commission (the "VLT commission" or the "commission") for the benefit of horse racing and horse breeding in Ohio. (*Id.* ¶ 14).

In 2013, the Ohio General Assembly enacted a law, codified at O.R.C. § 3769.087(C), to give the Ohio State Racing Commission (the "Racing Commission") greater responsibilities over setting the percentage of racinos' VLT commissions owed to the horsemen's associations. (*Id.* ¶¶ 17–18). The statutory framework dictates that between 9% and 11% of the racino's VLT commission be paid by the racino for the benefit of horse breeding and racing in Ohio. (*Id.* ¶ 14). The statute sets forth two methods to determine the exact percentage of VLT commission to be paid. First, the racino and the relevant horsemen's association could agree and contract for that percentage. Second, absent an agreement, the Racing Commission would set the percentage rate through an administrative rule, to be paid to the Racing Commission for the benefit of horse

breeding and racing. O.R.C. § 3769.087(C). In the latter case, the Racing Commission is required to set a rate for each racino within six months of the date the racino begins its VLT operations. *Id.* Because the rate-setting depends on the racino's capital expenditures, the racino must submit a capital expenditures report to the State for approval—a process over which the relevant horsemen's association has no control. (ECF No. 1 ¶ 22). Thus, in short, the statute required the Racing Commission to set the percentage rate owed to Plaintiff within six months after the first coin dropped at Belterra Park, assuming there was no agreement between the track and Plaintiff prior to such time. (*Id.* ¶ 18).

On May 1, 2014, Belterra Park reopened without having reached a rate agreement with Plaintiff. (*Id.*). Belterra therefore entered into an Escrow Agreement with the Racing Commission on that same day, set to terminate once the Racing Commission set the final rate by rule. (ECF No. 6 at Ex. A). The Escrow Agreement set aside 9% of Belterra's VLT commission to be paid to Plaintiff until the Racing Commission made its determination. (ECF No. 1 ¶ 20). Plaintiff began receiving the payments under the Escrow Agreement on May 1, 2014. (*Id.*).

By Plaintiff's account, Plaintiff and Belterra each understood that, pursuant to the statute, the actual rate was to be set by the Racing Commission, and that Belterra would need to make a "catch-up" payment to OHBPA for any difference between the 9% placeholder rate in the Escrow Agreement and the actual rate set. (*Id.* ¶ 22).

Defendants note that, on August 13, 2017, the Racing Commission finally promulgated the Ohio Administrative Code § 3769-2-43 (the "VLT Commission Rule"), requiring racinos to submit evidence of capital expenditures to the Ohio Facilities Construction Commission ("OFCC") to determine a VLT commission rate. (ECF No. 43 at 5). It was not until June 27, 2018, that the

3

Racing Commission finally passed Resolution 2018-05 ("the Resolution") setting the rate for Belterra Park at 9.95%. (ECF No. 6 at 4, ECF No. 6 at Ex. B).

On July 1, 2018, Defendants began paying, and Plaintiff began receiving, the 9.95% commission rate. (ECF No. 1 ¶ 24). Plaintiff has since demanded to be paid the difference between that rate and the 9% placeholder rate from May 1, 2014, through July 1, 2018. (*Id.* ¶ 26–27). This would mean that the real rate for that four-year period was 9.95%, and the Escrow Agreement was just a temporary placeholder that would require the remainder, a "true-up" payment[1], to be paid once the Racing Commission set a separate rate. Defendants emphasize, however, that the Resolution does not contain any express language making the higher rate retroactive to May 1, 2014. (ECF No. 24 at 4). Defendants instead argue that the opposite is true: the Escrow Agreement set *the* rate until the Racing Commission set a rate that would be used from that day forward. (ECF No. 43 at 8). Defendants contend that Plaintiff knows it is not due retroactive funds because Belterra and the Racing Commission negotiated over the catch-up payments before signing the Escrow Agreement, but no relevant term was included because neither was sure if the payments would be required under law. (*Id.*). Defendants have not made the catch-up payment.

## B. Procedural Background

Plaintiff filed a two-count Complaint on December 18, 2020, asserting claims for conversion and unjust enrichment. (ECF No. 1). Plaintiff's core factual allegation is that Defendants failed to pay OHBPA the marginal 0.95% of Belterra Park's VLT commission between May 1, 2014, and July 1, 2018, totaling $2,769,652 without interest. Defendants do not dispute that they never made the catch-up payment. Defendants moved to dismiss for failure to state a claim, which this Court denied on September 30, 2021. (ECF No. 24).

---

[1] The parties interchangeably use the terms "true-up" and "catch-up" to describe the alleged past due payments owed Plaintiff. For the sake of simplicity, this Court will hereinafter refer to these as "catch-up" payments.

On July 15, 2022, Plaintiff filed a Motion for Summary Judgment on both claims. (ECF No. 31). In the very first sentence of its motion, Plaintiff asserted that this case turns on a purely legal question: "whether Belterra Park must catch-up its VLT payments the OHBPA as required by the statute and Racing Commission resolution." (*Id.* at 1–2). Plaintiff's argument was that the Escrow Agreement was only a temporary arrangement and that O.R.C. § 3769.087(C) only contemplated one fixed rate—not variable rates over time. (*Id.* at 12). This is because, Plaintiff contended, the statutory rate for determining the payments may be set only by either an agreement of the racino and the horsemen, or by the Racing Commission—not by an agreement between the racino and the Racing Commission. (ECF No. 44 at 5). Plaintiff thus contended that the 9.95% rate set by the Racing Commission is the only rate set by a method prescribed by the statute. (ECF No. 31 at 13). On Plaintiff's interpretation of the statute, therefore, Defendants owe Plaintiff a fixed rate of 9.95% of its VLT commissions dating from the moment the first coin dropped on May 1, 2014, to the present. (*Id.*).

Rather than file a response to Plaintiff's motion, Defendants instead filed a Motion to Certify a Question of State Law to the Supreme Court of Ohio (ECF No. 33), concerning the same question. On the same day, Defendants filed a Motion to Stay Briefing of Plaintiff's Motion for Summary Judgment (ECF No. 34) pending this Court's ruling upon their Motion to Certify.

This Court ultimately ordered the parties to finish briefing Plaintiff's summary judgment motion. (ECF No. 40). Although this Court noted that the legal question at issue was one of first impression, it noted that "[t]he preferable course is to adjudicate the Motion to Certify with the benefit of full briefing on the Motion for Summary Judgment[.]" (*Id.* at 1–2).

Defendants then filed their opposition to Plaintiff's Motion for Summary Judgment. (ECF No. 43). In this response, Defendants argued that there is no private right of action—implied or

otherwise—under either O.R.C. § 3769.087(C) or the VLT Commission Rule. Further, Defendants contended that neither O.R.C. § 3769.087(C) nor the VLT Commission Rule are expressly retroactive. Even if they were, they would be unconstitutional because they both affect substantive rather than remedial rights. As such, Defendants maintained, neither the statute nor the Resolution can be the source of any obligation from Defendants to make catch-up payments to Plaintiff.

Both motions are ripe for review.

## II.      STANDARD OF REVIEW

### A.  Certification of a Question

Federal courts have the discretion to decide whether to certify questions to the state supreme court. *Tri Cnty. Wholesale Distributors, Inc. v. Labatt USA Operating Co., LLC*, No. 2:13-CV-317, 2014 WL 32307, at *2 (S.D. Ohio Jan. 6, 2014) (Marbley, J.) (citing *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009)). The Ohio Supreme Court Rules of Practice provide as follows:

> The Supreme Court may answer a question of law certified to it by a court of the United States. This rule is invoked if the certifying court, in a proceeding before it, issues a certification order finding there is a question of Ohio law that may be determinative of the proceeding and for which there is no controlling precedent in the decisions of this Supreme Court.

S.Ct. Prac. R. 9.1(A).

Simple "difficulty in ascertaining local law provides an insufficient basis for certification." *Tri Cnty. Wholesale Distributors, Inc.*, 2014 WL 32307, at *2 (quoting *Duryee v. U.S. Dep't of the Treasury,* 6 F. Supp. 2d 700, 704 (S.D. Ohio 1995)). This Court notes that "certification to the Supreme Court of Ohio . . . entails more delay and expense than would an ordinary decision of the state question on the merits by the federal court." *Drown v. Wells Fargo Bank, NA*, No. 2:10-CV-00272, 2010 WL 4939963, at *2 (S.D. Ohio Nov. 30, 2010) (quoting *Lehman Bros. v. Schein*, 416 U.S. 386, 394 (1974)) (internal quotations omitted). Thus, certification is inappropriate when "a

district court . . . believes that it can resolve an issue of state law with available research materials already at hand, and makes the effort to do so." *Id.* (quoting *Lehman Bros*, 416 U.S. at 395).

To decide in favor of certification, then, this Court must find that "there is a question of Ohio law that may be determinative of the proceeding and for which there is no controlling precedent in the decisions of this Supreme Court." S.Ct. Prac. R. 9.1(A). Even if this Court answers both inquiries in the affirmative, it must also consider if it can resolve the issue of state law with the materials at hand. *Tri Cnty. Wholesale Distributors, Inc.*, 2014 WL 32307, at *2 (quoting *Drown*, 2010 WL 4939963 at *2). Only if the Court finds that there is a genuine dearth of guidance from state court precedent, so much so that it would be extremely difficult to examine properly the questions presented, should it elect to certify a question to the Ohio Supreme Court. *Id.*

### B. Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. Evidence that is "merely colorable" or "not significantly probative" will not defeat summary judgment. *Id*. at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion, as well as "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

7

Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

"The Court views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Even so, "[t]he mere existence of a scintilla of evidence to support [the nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252).

## III.   LAW AND ANALYSIS

### A.  Defendants' Motion to Certify

Defendants' Motion to Certify proposed the following question for certification to the Ohio Supreme Court:

> Pursuant to Ohio Rev. Code § 3769.087(C) and Ohio Admin. Code 3769-2-43, if the state racing commission (the "Racing Commission") and a video lottery terminal agent ("Agent") agree on a video lottery terminal ("VLT") commission percentage to be paid for the benefit of breeding and horse racing in Ohio in advance of the Racing Commission issuing a resolution establishing a VLT commission, is the Agent responsible for making an additional payment to the Racing Commission for any difference in the VLT commission rate for that period between the time the Agent began operating VLTs and the time the Racing Commission issues its resolution?

(ECF No. 33 at 1).

As set forth above, to certify a question to the Ohio Supreme Court, this Court must be satisfied as to the following: (1) the question involves Ohio law that may be outcome-determinative of the proceeding; and (2) there is no controlling Ohio Supreme Court precedent. Ohio S. Ct. Prac. R. 9.01(A); *Stevens v. City of Columbus, Ohio*, No. 2:20-CV-1230, 2020 WL

7021422, at *2 (S.D. Ohio Nov. 30, 2020) (Marbley, J.). This Court maintains the discretion to decline certification even if the movant demonstrates the existence of both prongs. *Tri Cnty. Wholesale Distributors, Inc.*, 2014 WL 32307, at *2.

If the statute is interpreted such that Plaintiff is entitled to the catch-up payments, Plaintiff would have a right to the funds which it alleges Defendants wrongfully retained. On the other hand, if Plaintiff is not statutorily entitled to the payments, both of Plaintiff's claims necessarily fail. As such, the answer to the proposed question of entitlement under O.R.C. § 3769.087(C) is dispositive of this proceeding. This Court thus finds that the first prong is met. This Court has also acknowledged that this lawsuit presents an issue of first impression. (ECF No. 40 at 1). As such, the second prong is also met.

This Court finds nonetheless that certification of this question is inappropriate. The unique factual circumstances of this case make it unlikely that the resolution of the legal question at issue would carry precedential value. The paucity of court rulings interpreting O.R.C. § 3769.087(C) to-date indicates the low likelihood that future courts will grapple with this legal question. Further, as this Court will explain in resolving Plaintiff's Motion for Summary Judgment, the legal question at issue is readily resolvable despite presenting an issue of first impression. As such, this Court **DENIES** Defendants' Motion to Certify.

### B.  Plaintiff's Motion for Summary Judgment

#### 1.  *The Applicability of O.R.C. § 3769.087(C)*

##### a.  *Plaintiff's Arguments*

In its Motion for Summary Judgment, Plaintiff argues that the parties do not dispute the facts that are material to Plaintiff's conversion and unjust enrichment claims. Instead, Plaintiff contends, the dispute lies in the application of O.R.C. § 3769.087(C)—a legal question proper for

resolution at summary judgment. Specifically, Plaintiff argues, this case turns on whether Defendants must make the catch-up payments, which itself depends on the Court's application of O.R.C. § 3769.087(C) and Resolution 2018-05. Plaintiffs contend that this is true because Plaintiff's entitlement to the payment is a necessary element of both its state-law claims.

Plaintiff's arguments thus center around the interpretation of the statute. Plaintiff argues that O.R.C. § 3769.087(C) provides that the VLT commission rate of 9–11% could only be determined either by agreement between Plaintiff and the racino and or by a determination of the Racing Commission. Here, Plaintiff argues, because Belterra Park was the only racino in the state with which Plaintiff failed to reach agreement on the VLT commission rate, the parties entered a *temporary* "escrow agreement" of 9% pending an administrative ruling by the Racing Commission. Plaintiff maintains that the Escrow Agreement was only meant to be temporary; it could not set the commission rate because it was not a method authorized by the statute. As such, Plaintiff argues, the 9.95% commission rate must be backdated because the statute considers only one fixed rate that is to be applied from the moment the first coin is dropped. Plaintiff also seeks summary judgment on the issue of its entitlement to prejudgment interest and costs on its conversion damages.

Plaintiff argues that the timing of the Racing Commission's decision on the commission rate is immaterial, as is whether Defendants knew that catch-up payments would be required. Instead, Plaintiff contends, only the language of the statute and the Resolution matter. Plaintiff maintains that its ability to recover does not depend on the statute providing a private right of action, because its claims arise under *common law*. As such, Plaintiff contends, common-law actions do not depend on a private right of action. Even so, Plaintiff argues, the statute implies a private right of action because it contemplates a remedy for situations like the instant matter.

10

Finally, Plaintiff argues, the question of whether the statute applies retroactively is irrelevant; instead, Plaintiff merely seeks enforcement of the determined rate. After all, Plaintiff contends, it does not seek any payments predating the statute's enactment. Plaintiff argues that Defendants' theory of retroactivity is premised on the faulty theory that the statute does not require payments to be made until the commission rate is set. Plaintiff maintains that, because the statute clearly contemplates a single rate, once the Racing Commission determined that rate, it applied to the entire time period that Belterra Park operated the VLTs.

### b. Defendants' arguments

Defendants agree that there is no dispute concerning the material facts at issue. Instead, Defendants contend, Plaintiff's motion is premised upon the erroneous view that O.R.C. § 3769.087(C) entitled it to catch-up payments due prior to the Racing Commission's Resolution setting the commission rate. Defendants thus argue that summary judgment is warranted given that their interpretation of the statute is dispositive of the matter at hand.

Defendants first argue that Plaintiff lacks a private right of action to enforce either the statute or the VLT Commission Rule. Defendants note that this Court already ruled that there is no express right of action in either the statute or the VLT Commission Rule. Further, Defendants contend, neither the statute nor the rule provide for an *implied* right of action. Defendants next argue that, even if Plaintiff has a private right of action, neither the statute, the VLT Commission Rule, nor the Resolution are expressly retroactive. As such, the retroactive application of either is barred by O.R.C. § 1.48, which states that "[a] statute is presumed to be prospective in its operation unless expressly made retrospective." Defendants contend that the statute does not require commission payments to be paid starting from the time the first coin is dropped into a VLT machine. Defendants also emphasize that the Escrow Agreement is devoid of language holding

Defendants liable for additional payments. Defendants claim that both Plaintiff's conversion and unjust enrichment claims fail under Defendants' interpretation of the statute. Defendants last argue that they did not act in bad faith in negotiating with Plaintiff nor knew that Plaintiff was entitled to the additional 0.95% prior to the Resolution's enactment. As such, Defendants assert, both Plaintiff's conversion and unjust enrichment claims fail.

*c. The Court's Analysis*

When interpreting a state statute, federal courts must predict how the state supreme court would interpret the statute in the absence of state interpretations of the same. *Bevan & Assocs., LPA, Inc. v. Yost*, 929 F.3d 366, 374 (6th Cir. 2019). For interpreting unambiguous statutory language, the Ohio Supreme Court provides the following guidance:

> When confronted with an argument over the meaning of a statute, this court's paramount concern is the legislative intent of its enactment. In discerning legislative intent, [Ohio courts] consider the statutory language in context, construing words and phrases in accordance with rules of grammar and common usage. And when the meaning of a statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary.

*Id*. (quoting *State ex rel. Prade v. Ninth Dist. Court of Appeals*, 151 Ohio St.3d 252, 87 N.E.3d 1239, 1242 (2017)).

Even if the plain-language application of an Ohio statute would make for debatable policy implications, the Court must follow it unless "the unambiguous language of a statute would yield an obviously unintended result" reparable by resolving an obvious "technical or ministerial error . . . not includ[ing] substantive errors arising from a drafter's failure to appreciate the effect of certain provisions." *State v. Parker*, 2019-Ohio-3848, 157 Ohio St. 3d 460, 465, 137 N.E.3d 1151, 1157.

O.R.C. § 3769.087(C) provides the following:

> Unless otherwise agreed to by the video lottery sales agent and the applicable horsemen's association recognized by the state racing commission to represent such persons . . . within six months after the date a video lottery sales agent begins

operating as such for video lottery sales agents not operating as such on September 29, 2013, the state racing commission shall direct through rule that a percentage of the lottery sales agent's commission . . . be paid to the state racing commission for the benefit of breeding and racing in this state. The percentage so determined shall not be less than nine per cent or more than eleven per cent of the video lottery terminal income, and shall be a sliding scale based upon capital expenditures necessary to build the video lottery sales agent's facility. The aggregate of one hundred per cent of video lottery terminal income minus the lottery sales agent's commission percentage as determined by the state lottery commission plus the percentage of the lottery sale agent's commission, as determined by the state racing commission or otherwise agreed to by the video lottery sales agent and the applicable horsemen's association . . . shall not exceed forty-five per cent of the video lottery terminal income . . . .

Ohio Rev. Code § 3769.087(C).

Pursuant to this statute, the Racing Commission promulgated Ohio Administrative Code § 3769-2-43(A)[2], which this Court has referred to throughout this Order as the "VLT Commission Rule." The provision obligates video lottery sales agents to pay an amount between 9%–11% to the applicable horsemen's association pending the determination of the rate even if they have not entered into an agreement in accordance with O.R.C. § 3769.087(C).

The parties debate whether O.R.C. § 3769.087(C), the VLT Commission Rule, or the Resolution require Defendants to make catch-up payments to Plaintiff reimbursing the 0.95% marginal rate gap for the period between May 1, 2014, and July 1, 2018. The answer is "yes." This Court first resolves two preliminary disputes before addressing its interpretation of the statute.

---

[2] Ohio Administrative Code § 3769-2-43(A) reads thus:

Permit holders licensed by the state racing commission who are video lottery sales agents of the Ohio lottery who have not entered into an agreement with the applicable state racing commission recognized horseman's association in accordance with division (C) of section 3769.087 of the Revised Code shall pay not less than nine per cent or more than eleven per cent of the video lottery terminal income for the benefit of breeding and racing in Ohio. The percentage so determined shall not be less than nine per cent or more than eleven per cent of the video lottery terminal income, and shall be a sliding scale based upon capital expenditures necessary to build the video lottery sales agent's master facility plan that was submitted and approved pursuant to Chapter 3770:2-12 of the Administrative Code. The determination of the amount of the allowable expenditure under the master facility plan will be determined by the Ohio facilities construction commission, unless previously determined by the state architect's office . . . .

13

As an initial point, whether O.R.C. § 3769.087(C) applies retroactively has no impact on the instant matter. Contrary to Defendants' argument, the Ohio Supreme Court has indicated that a law is understood to be "retroactive" if it applies to cases that were pending on the date that the law entered into effect. *See, e.g., Kiser v. Coleman*, 28 Ohio St.3d 259, 262, 503 N.E.2d 753, 756 (1986) (holding that where "there is no clear indication of retroactive application, then the statute may only apply to cases which arise subsequent to its enactment."); *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 103, 106, 522 N.E.2d 489, 493, 496 (1988) (finding that the legislature clearly expressed its intent that former O.R.C. § 4121.80(H) be retroactive by writing that "[t]his section applies to and governs any action . . . pending in any court on the effective date of this section . . . notwithstanding any provisions of any prior statute or rule of law of this state."); *Ackison v. Anchor Packing Co*., 120 Ohio St.3d 228, 2008-Ohio-5243, 897 N.E.2d 1118, ¶ 8 (characterizing as an inquiry into *retroactivity* the question of whether a group of Ohio statutes, when they became effective, applied to pending cases). Plaintiff filed the instant case after O.R.C. § 3769.087(C) became effective, seeking catch-up payments relating to benefits conferred after the statute became effective; as such, the application of said law to this case would not be *retroactive*.

This Court next dispenses with Defendants' argument that neither the statute nor the VLT Commission Rule allow for an implied private right of action. Here, Defendants seemingly relitigate this Court's finding that Plaintiff is not required to have a cause of action created by the statute. In its prior Order, this Court concluded from the outset that "since [Plaintiff] does not state a cause of action under the statute, it is not necessary for them to establish a statutory right of action, express or implied." (ECF No. 24 at 8). This Court remains convinced of the correctness of its previous analysis. This Court nonetheless found in the alternative that O.R.C. 3769.087(C)

does not necessarily lack an implied private right of action. (ECF No. 24 at 10). In so doing, this

Court balanced the relevant factors for inferring a private right of action set out by the United

States Supreme Court:

> First, is the plaintiff one of the class for whose especial benefit the statute was
> enacted . . . ? Second, is there any indication of legislative intent, either explicit or
> implicit, either to create such a remedy or to deny one? Third, is it consistent with
> the underlying purposes of the legislative scheme to imply such a remedy for the
> plaintiff?

(*Id.*) (quoting *Cort v. Ash*, 422 U.S. 66, 78 (1975)).

Making all reasonable inferences in Plaintiff's favor, this Court found that the balancing of

the *Cort* factors weighed in favor of finding an implied private right of action. At the summary

judgment stage, Defendants have submitted no new evidence or law changing the legal landscape

since this Court last passed on this question. As such, this Court finds, consistent with its earlier

analysis, that the statute contains an implied private right of action in the instant case.

Finally, this Court considers the applicability of the statute itself to the matter at hand.

O.R.C. § 3769.087(C) mandates that the VLT sales agent's commission be paid to the state racing

commission applying a commission rate determined via one of two methods: (1) the VLT sales

agent and the horsemen's association agree on the commission rate; or (2) the Racing Commission

determines the commission rate. This Court finds no indication from the language of the statute

that the legislature contemplated or intended a scenario in which the VLT sales agent and the

horsemen's association proceeded using a commission rate determined using another method.

Given the clear language in the statute—that the commission rate can be set via one option or the

other—this Court will certainly not read into the statute that another method is permissible.

The statute and the VLT Commission Rule, read together, make apparent that the relevant

rate may be set only by either an agreement between the proper parties or a determination by the

Racing Commission. The parties agree that the proper parties never entered into an agreement to set the rate. As such, the only other statutorily approved method available to set the rate was by a determination from the Racing Commission. Defendants' position is implausible at this stage for the same reasons that this Court stated in its prior Order:

> To support Defendants' . . . position, the Court would need to read a clause into the statute allowing for different rates before and after the Racing Commission's determination, into the Escrow Agreement to state that the 9% set-aside is in full satisfaction, and into the resolution to set an effective date of July 1, 2018 . . . [N]one of this is permissible.

(ECF No. 24 at 13).

It is instead more plausible that, given "the statute and regulation refer to only one percentage rate, falling between 9% and 11% as *determined by the Racing Commission* [and] . . . do not provide any method for changing the percentage so determined, [this] suggests that the rate is intended to be fixed—even if it could not be known to a certainty until the State had reviewed the capital expenditure reports." (*Id*. at 12).

Defendants have not offered that Plaintiff and Belterra Park indeed entered an agreement to set the rate or evincing that the parties intended that the 9% set-aside would be in full satisfaction of Defendants' payment obligations. The unrebutted evidence bearing on the present analysis is the following: the only agreement implicating the parties before the Resolution entered effect is the Escrow Agreement providing for a 9% payment; Plaintiff and Belterra Park never entered into an agreement on the payment rate; and the Racing Commission determined the commission rate to be 9.95% in its Resolution. Simply put, for the full period that a VLT sales agent operated VLT gaming, the legislature intended for the horsemen to be compensated in one of the two prescribed manners. Even if the Escrow Agreement provided for a different arrangement, the statute simply does not permit a racino to discharge its duties by contract with the Racing Commission.

16

This Court finds the best way to apply the statute is to do so based on its plain meaning. Plaintiff was due payment using a rate determined *by the Racing Commission* in the absence of an agreement with Belterra Park. The Racing Commission did eventually determine a commission rate of 9.95%. This commission rate is thus applicable for the entire period that Belterra Park operated its VLT gaming. Indeed, the statute provides that the Racing Commission must set the rate within six months. This did not happen. No authority indicates, however, that the Racing Commission's tardiness has any relevance to this case. As such, this Court finds that statute requires Defendants to pay Plaintiff the 9.95% rate from May 1, 2014, to June 30, 2018.

### 2. *Conversion*

Having found that Plaintiff is entitled to the 9.95% catch-up payments, this Court considers Plaintiff's Motion on its conversion claim.

Plaintiff argues that summary judgment is due on its conversion claim because Defendants owe them the catch-up payments, which establish Plaintiff's right to the allegedly converted property. Plaintiff then argues that there is no dispute that Defendants withheld the funds at issue, but rather whether Plaintiff is entitled to the withheld funds. Plaintiff maintains that the parties do not dispute that the funds at issue total $2,872,910.45; therefore, the damages element is satisfied. Last, Plaintiff argues that it is entitled to summary judgment to prejudgment interest and costs because Ohio law requires courts to award prejudgment interest on converted funds.

Defendants argue that their retention of the alleged "catch-up" payments cannot be wrongful because Plaintiff has no right to them. Defendants contend nonetheless that their alleged behavior prolonging the Racing Commission's delay in setting the commission rate was not in bad faith. Defendants note this Court's reliance upon Plaintiff's allegations that Defendants submitted to the Racing Commission "unrealistic and overly aggressive capital expenditures in an apparent

effort to persuade authorities that it was entitled to pay a lower rate" in considering the wrongfulness prong of the conversion claim in its prior Order. (ECF No. 43 at 16) (citing ECF No. 24 at 14). Defendants argue, however, that Plaintiff's characterization is undermined by evidence that over 85% of their submitted capital expenditures were eventually granted. (ECF No. 43 at 13) (citing ECF No. 31-5).

The elements of a conversion claim under Ohio law are: (1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages. *Figgie v. Figgie*, 8th Dist. No. 109834, 2021-Ohio-1812, 173 N.E.3d 122, ¶ 11 (internal quotations omitted). Conversion is an intentional tort. *Cent. Ohio Med. Textiles v. PSC Metals, Inc.*, 10th Dist. Franklin No. 19AP-167, 2020-Ohio-591, ¶ 25. As stated by Ohio courts, the plaintiff need not show that the defendant possessed a wrongful intent to interfere with the plaintiff's property rights; however, "a plaintiff must demonstrate that the defendant intentionally exercised dominion or control over the property." *Id.*

This Court previously noted that the issue of Plaintiff's statutory entitlement to the funds is dispositive as to both the first and second elements. (*See* ECF No. 24 at 14). Given this Court's finding here that Plaintiff was conclusively entitled to the funds, the first and second elements are satisfied. *See supra* Section III.B.1. With respect to the third element, the parties do not dispute that Plaintiff suffered damages from Defendants' withholding of said funds. Defendants admitted that Plaintiff's damages calculation is correct. (ECF No. 31-2 ¶ 12). As such, there is no genuine dispute of material fact concerning Plaintiff's conversion claim. This Court therefore **GRANTS** Plaintiff's Motion for Summary Judgment on this issue.

18

*a.  Prejudgment Interest on the Conversion Claim*

Plaintiff also moves for prejudgment interest on their conversion claim on the basis that "Ohio law" requires courts to award it on converted funds. Defendants do not address this issue. Even if Ohio law compels this Court to award prejudgment interest in this matter, Plaintiff fails to specify whether it moves for prejudgment interest pursuant to statute or Ohio common law. This is a problematic oversight. If, for example, Plaintiff moves pursuant to Ohio common law, the trial court retains discretion over whether to award such interest on a conversion claim as part of the compensatory award. *Gorsha v. Clark*, No. 2:18-CV-508, 2022 WL 278973, at *10 (S.D. Ohio Jan. 31, 2022) (quoting *Masterson v. Weaver*, 5th Dist. Morgan No. CA-05-014, 2006-Ohio-1069, ¶ 50). The trial court also retains discretion to determine the date for the calculation of the interest. *Masterson*, 5th Dist. Morgan No. CA-05-014, 2006-Ohio-1069, ¶ 50.

Given that Plaintiff fails to indicate whether it makes its request pursuant to statute or common law, this Court **DENIES** its request for summary judgment on this issue. Plaintiff may nonetheless file a motion for prejudgment interest for this Court's consideration.

*3.  Unjust Enrichment*

Plaintiff also moves for summary judgment on its claim for unjust enrichment. Concerning the benefit element, Plaintiff argues that the facts are undisputed that Defendants kept the 0.95% set-aside between May 1, 2014, and July 1, 2018. (ECF No. 31 at 16) (citing ECF 31-2 ¶ 9). Although Defendants refused to pay the proper commissions, Plaintiff contends, Plaintiff continued providing Defendants with the benefit of quality thoroughbred racing. (*Id.*) (citing ECF 31-1 ¶ 8). Concerning the knowledge element, Plaintiff argues that Defendants indisputably knew they were keeping the funds and would have to pay Plaintiff between 9–11% of its VLT revenues once the Racing Commission made its ruling. (*Id.* at 19) (citing ECF No. 31-2 at ¶ 9). Plaintiff

19

argues that it does not have to prove that Defendants knew they were retaining the funds *unjustly*. Plaintiff argues that Defendants' undisputed retention of the funds alone is sufficient to warrant summary judgment if this Court determines that Plaintiff is entitled to the catch-up payments. Further, Plaintiff argues, Defendants' retention of the funds was unjust for the additional reason that they had no reasonable expectation that the statutory minimum of 9% it escrowed was final.

Defendants argue that Plaintiff's unjust enrichment claim fails because it had no statutory entitlement to the catch-up payments. Further, Defendants argue, Plaintiff's claim that Defendants knew that it owed the purported catch-up payment at any time is unsupported.

The elements of an unjust enrichment claim under Ohio law are: (1) a benefit conferred by the plaintiff upon the defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment. *MVB Mortg. Corp. v. F.D.I.C.*, No. 2:08-CV-771, 2010 WL 654051, at *3 (S.D. Ohio Feb. 19, 2010) (internal quotations omitted).

This Court finds that the first and second prongs are satisfied by the undisputed facts. This Court's analysis in its prior Order remains relevant. With respect to the first prong, this Court previously observed that, if Defendants retained funds to which Plaintiff had a statutory right, "a benefit accrued to Defendants' bottom line because those funds were not flowing to OHBPA." (ECF No. 24 at 16). Defendants do not argue that they did not retain those funds.

With respect to the second prong, Defendants do not dispute that they had knowledge of the benefit conferred by Plaintiff. Indeed, there is no factual dispute that Defendants knew they were retaining funds that they might eventually owe Plaintiff. There is no requirement that Defendants knew it retained the benefit "wrongly"; it is sufficient that Defendants were simply aware of the benefit which Plaintiff conferred upon them. *See, e.g., Nichols v. State Farm Mut.*

*Auto. Ins. Co.*, No. 2:22-CV-16, 2022 WL 6671695, at *4 (S.D. Ohio Oct. 11, 2022) (finding the second prong satisfied simply because Defendant State Farm was aware of the benefit conferred by Plaintiff when Plaintiff accepted State Farm's negotiated deduction from the amount due Plaintiff); *Price v. Gulfport Energy Corp.*, No. 2:20-CV-01057, 2020 WL 5433683, at *4 (S.D. Ohio Sept. 10, 2020) (finding that Plaintiffs sufficiently pled the second prong where they alleged merely that Defendant Gulfport knowingly accepted the benefit conferred by drilling on Plaintiffs' land for oil and gas and retaining the benefit).

This Court also finds that Plaintiff satisfies the third element. This element, which requires this Court to find that Defendants retained the benefit "under circumstances where it would be unjust to do so without payment," involves a totality-of-the-circumstances approach. *See Cleveland Cent. Catholic High School v. Mills,* 8th Dist. No. 106816, 2018-Ohio-4873, 125 N.E.3d 328, ¶ 50 (explaining that, "[i]n determining whether it [is] unjust to permit a defendant to retain a benefit conferred upon it by the plaintiff . . . 'the sum of the circumstances, as well as the equities involved in the case' must be considered."). This Court's determination that Plaintiff is due compensation for the period during which it was paid the lower rate is dispositive here.

In its prior Order, this Court found that Plaintiff plausibly alleged that Defendants engaged in bad faith by delaying their submission of the capital expenditure report needed by the Racing Commission to determine the rate. (ECF No. 24 at 16–17). In essence, Plaintiff alleged that Defendants delayed their submission to the Racing Commission to buy more time before having to pay a (likely) higher rate than the baseline. Defendants submit evidence calling this into question. (*See* ECF No. 43 at 13). This factual question is irrelevant to this Court's analysis, however. The question is whether there is a genuine issue of material fact as to whether "defendant's retention of the benefit under the circumstances is unjust without compensation or

payment." *Mentor Exempted Village School Dist. Bd. of Edn. v. Lake Cty. Educational Serv. Ctr. Governing Bd.*, 11th Dist. No. 2015-L-135, 2016-Ohio-7649, 74 N.E.3d 706, ¶ 89. This Court finds that it is not.

Having found that no reasonable jury could find for Defendants on Plaintiff's unjust enrichment claim, this Court **GRANTS** summary judgment on this issue.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Certify (ECF No. 33) is **DENIED** and Plaintiff's Motion for Summary Judgment (ECF No. 31) is **GRANTED IN PART AND DENIED IN PART**. Specifically, this Court **GRANTS** summary judgment on Plaintiff's claims for conversion and unjust enrichment and **DENIES** summary judgment on Plaintiff's claim for prejudgment interest on its conversion claim.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:  March 30, 2023**